The third case of the morning, related, Appeal No. 23-17-88, Circle City Broadcasting v. DISH Network. Mr. McNeil, we'll welcome you back. May it please the Court, the issue with the DISH case is similar in that it's a Section 1981 case, but it's different evidence and it's a different summary judgment entry. And in this summary judgment entry, while considering the law of pretext that we've already talked about, the District Court did two things. First, it accepted DISH's version of the events, and second, it imposed a standard on Circle City's evidence where it required irrefutable proof that something was true with respect to the market rates. And that is not the summary judgment standard. In this case, it's a much more compact negotiation period. And what we have for evidence of a pretext is Melissa Bodie, who is the negotiator for DISH, contacts DeJuan McCoy, the owner of Circle City Broadcasting, majority owner of the plaintiff, and says, you know, I hear you're buying these stations, Mr. McCoy says let's wait until we close, and then Ms. Bodie sends this email, it's 84-24, page 2 in the record, where she says Mr. McCoy is expressing suspicion about why DISH is suggesting there would be no rates. She says just because a specific station is getting paid under a contract doesn't mean it's worth what it's getting paid. And then she goes on to describe how a big group like Nexstar can extract money for stations that DISH doesn't want to pay for to get the stations DISH is willing to pay for. Fine. Fast forward two months, September of 2019, now they've closed on the station purchased by Circle City, September 19th, 2019. Ten days later, Mr. McCoy and Ms. Bodie are emailing, September 29th, and Mr. McCoy proposed a rate, Ms. Bodie's response is the most watched program on Wish is your morning news and it's streamed live online for free, and both of these channels carry the Cubs who are leaving at the end of the season, this is back when they started their own, the Cubs marquee network. So now we have the Cubs and local news online for free as important reasons. Okay, so far, not necessarily contradictory or inconsistent. Ms. Bodie goes on to say, our offer stands to continue to carry for no fees and we'd be happy to explore different term options, but I don't think there's much more we can do here on rates. Term meaning time period? Yeah, the length of time for the contract, yes. Then on October 2nd, this is at 84-44, Ms. Bodie feels the need to clarify what she had just said. She says, in my previous emails, I explained to you why DISH was not, why DISH believes the value of your stations you purchased declined significantly, and while I stand behind those statements regarding their loss of value, I want to acknowledge my statement was not clear on one thing. DISH does not assign the loss of value of your stations to your ownership of the stations. This loss in value is due to the sports rights and the ability of anybody to watch the news online, unauthenticated, for free. So before, in July, the ownership group was the reason, the most important thing. Who owned the stations mattered. Now when they're in the- You mean who owns, in the sense of Nexstar versus a small company, or? Yes, taking Melissa Bodie's statement in July at face value, she says the fact that Nexstar owns these stations is the fact. So the size of, but it's not just the ownership, she refers to the structure of the ownership too, like I'll say 100 stations or something, whatever the number was. Right. And the leverage that goes with that. Right. Sure. And the leverage, well I'll get to leverage, what DISH says to Mr. McCoy in October is that's not why DISH values your stations differently. It's because of the online news and the Cubs. But that's where their own- Which is what they said back in September, right? You just said that. She said it in September, on September 29th, and then three days later she's clarifying. It's not the ownership value, it's not the ownership, your ownership of the stations that's causing the loss in value, it's the loss of the property. So she repeats the other reasons. What's clarifying about that? You're insisting that it's clarifying, what's clarifying about it? Right. She's clarifying that it's, she's disavowing her July statement is what she's doing. She said in July the fact that Nexstar owns the stations is what drives the rate there. In September she says, and then clarified in October, she says it's not that you own the stations that makes the difference, it's that your news is online for free and you're losing the Cubs. Your point is the explanation's shifting a little bit. Exactly. In fact, not only is it shifted, she's moved away from the original stated reason. And it's worse because the internal documents at DISH show that it's a phony explanation. For WISH, DISH did an analysis of the top 500 programs for both stations. The Cubs were in less than 1% of the top 500 broadcasts for WISH-TV, and its news package was in 96.4% of the top 500 programs, even though it was available online for free, and even though Nexstar made it available on the website for free when Nexstar owned it. And the Cubs programming, or I'm sorry, the news programming outperformed the local Big Four affiliates at ABC and at times exceeded Fox's ratings, the local Fox affiliates' news ratings. So not only did the reason shift, but the new reason doesn't hold up under even a modicum of scrutiny. That by definition in the case law is pretext. But there's more. We get to this specified independent rate issue. So the media general contract of 2015, and then the Nexstar, after Nexstar acquires those into a category, a rate category that's in between the Big Four rates and the traditional CW and MyNetwork rates with only one other station. Again, it's the KRON station out in San Francisco. So there is an acknowledgment by DISH that WISH has some intrinsic independent value. And in another context, Melissa Bodie's Boss is Boss described what an MVPD was willing to pay for stations is evidence of the market rate. And so when Circle City is negotiating with Comcast and Charter and presenting fee proposals to DISH that are moving in the direction of where the most favored nation rate ends up, Miss Bodie says in January, well, I appreciate the offer. This is in response to the MFN proposal, which means if somebody gets a lower rate, then you get that lower rate too. And Miss Bodie says, well, I appreciate the offer. The rates you're proposing are not going to work for DISH. I can send you a markup of the draft, but if what you're proposing is take it or leave it, then it may be a waste of time. So now we're in a situation where DISH has two things it's done. First, it's said in the past that what an MVPD is willing to pay for stations is evidence of the market rate. Then it receives a proposal that says, here's our most favored nation rate. And while DISH in the brief points out that wasn't the actual final rate that was agreed upon, it's not relevant because DISH will get the lowest rate, whatever it is, between DISH, Comcast, and Charter. And on the leverage point, to come back to that, that's been an argument that DISH has raised with the FCC in opposing mergers and consolidations for years, and they've been unsuccessful. So the leverage question, while conceptually may be interesting, on the evidence presented in this case, again, all Miss Bodie had to say was, consistently, we're not going to pay you a rate because you're not Nexstar. But what she said in October 2019 was, I want to be clear, we're not assigning the loss in value to your ownership of the stations. We're assigning it to these two reasons that don't hold up under scrutiny, that are inconsistent with our internal documentation, and are not the reason we gave you originally. That's pretext. I'd like to reserve the balance. Very well. Thank you, Mr. McNeil. Mr. Maley. Your Honors, may it please the Court, I'm John Maley, counsel for DISH Network LLC. I'm pleased to respond to my friend's comments. I'll jump in. The two key points of this case, the leverage component, and he just, counsel just emphasized this, the record is undisputed, by the way, plaintiff never disputes any of the appellate, never disputes any undisputed facts in this case, is that DISH has consistently taken the position with the FCC publicly that these mergers where companies are growing and have more leverage and more negotiation power are of concern. And going back to your Honor's question earlier, what Nexstar was doing, for instance, with DISH, was saying, we're going to spread these rates across all these stations that have different value. Take a Chicago Big Four station and an Indianapolis non-Big Four station. So you're saying it was Nexstar that was distributing the payments and it wasn't DISH saying, I'm going to pay you nothing, I'm going to pay you a lot, I'm going to pay you something in between. Absolutely, Your Honor. And that's undisputed in this record. And so the stations in Indianapolis, Wish and Windy, under the Nexstar contract, actually issued in 2016, had a high inflated rate. When they had to sell those off to, because of the 39% threshold within the FCC, the contract allowed DISH to exempt out of those rates and start new negotiations. So Ms. Bowdy, who's accused here of, she is undisputedly the sole decision maker. She's accused of being the racist here, married to a black man, Hispanic herself. She's negotiated, undisputed, 1,500 of these retransmission contracts through the years. There's no allegation that any of them otherwise have been racist. They recruited... Is there any evidence in the record, I mean, I realize black owned stations are rare, that's I don't think too controversial, but is there any evidence about the ownership structure of anyone else? Yes, Your Honor. Undisputed in the record is that DISH has zero pay retransmission agreements with multiple white owned companies. And that's, those are repeated in the ECF filings at our appellee's brief, page six, multiple of those. DISH has over 500 customers that are not receiving any rates. Now, why would a broadcaster do that? Why would other stations, and we've listed by city and name and call signs a number of those? Because it's eyeballs. If you can get your station on Mr. Paul's DirecTV client, on DISH, on Comcast, go down the line, that's good. Let's add revenue. Exactly, Your Honor, exactly. And now, Mr. McCoy has created a great business in Indianapolis. He's done many great things in Wish and Windy are good stations, but they're non-Big Four. They have less value. Just like in our profession, growing up in Richmond, Indiana, my dad was a lawyer at a four person firm. All the lawyers in this case are with big firms. Can we negotiate better rates with our legal vendors? Yes, because the ultimate price tag is more. That's what Nexstar is able to do with the DISH, because DISH and DirecTV, if they don't have Big Four stations, how are they going to go sell to the customers, us, the consuming public? The pretext argument, respectfully, when the court sticks with the factual record as Chief Judge Pratt did, and she dressed it, by the way, this was a carefully handled case, oral argument, which is unusual in the Southern District of Indiana, extensive briefing. She had denied a 12B6 dismissal motion. So she was very cautious and careful and prudent about this. So you have Ms. Bodie, who's been the one going to the FCC on the leverage issue. She's the one that initiates then with Mr. McCoy, hey, you're going to lose, we can't carry you by law, you can't just carry a station, obviously, unless we have an agreement. But here's the first agreement that's like everyone else she starts with who's not Big Four, has no payment for it. And she explains why. Because of leverage. You're not the same as Nexstar. Back and forth, back and forth, and he keeps raising new issues. When he makes a proposal, he says, but our news is great, and we've got the Cubs and the Sox. Okay. So does she respond to that? Is that racist to respond to that? Of course not. All her communications are cold. He admits she's not racist. There's no evidence of race. NABOB, the National Association of Black-Owned Producers, Broadcasters, sued my client initially, ultimately stipulated after discovery, and stipulated there's no evidence, no one else complains about race discrimination. So she responds to him and says, okay, your news is good, but you can get it on your phone. He's streaming live. And yes, the Cubs and Sox are good, but you're losing them at the end of 2019. When Nexstar brought on Wish and Wendy, that wasn't the case. So is that... Was it the Sox also? I just noticed the Cubs. Yeah, on Wendy. So is that a lie? Is that racist? Well, of course not. She's engaging in good faith, as required by the FCC, with her counterpart. Always professional. So then we move forward, and there's more back and forth. By the way, during this time period, Circle City keeps threatening, you don't do this, we're going to try to block your T-Mobile acquisition. You don't do this, we're going to go public. And sure enough, that all happened. They sent letters to Attorneys General, Department of Justice. And what did Ms. Bodie do? She kept engaging him consistently, putting that noise aside, and ultimately extended an offer with money. Significant money that they didn't have to accept, if they could have chosen must carry, but they instead struck a better deal with two other providers. My client chose not to, Mr. Paul's client chose not to. That's the market. That's America. And they were within their rights to do that. That's not racist. There's simply no evidence of discrimination in this case, and there is no lie from Ms. Bodie. A few other key undisputed facts, one of the reasons that Ms. Bodie had to keep going back and responding, and it's a different response, is because there are five times in the record where Mr. McCoy said, you're not playing fair with me because I'm a small business, because of my size. So she responded to that. By the way, he didn't say because of my race. That's nowhere in the record is there evidence about Ms. Bodie knowing his race. Now you could infer because he was sending money times, links about himself, and different things, and he's well covered in the media, so she may well have known from those, but different than what you heard in the last case. The other key undisputed fact in this is that at the end of the day, he had the opportunity to engage either must carry or for a reasonable price as determined by this offer, and he chose not to. And that's his prerogative. Just to go to your question, yes, when he learned that he wasn't going to be carried the same rates, his multimillion dollar purchase price for these stations reduced by 30-some million. That value was recognized and discounted by him and that transaction. So at the end of the day, Your Honors, what we have respectfully is a very straightforward routine summary judgment where Chief Judge Pratt does all the right things. Her opinion is good. It applies direct law. She cites to Comcast, there's some quarreling in the brief about articles, a or the cause. She followed Comcast that says but for cause, as the Ninth Circuit had not in Comcast. And her opinion, to just highlight a few places where she does this, going from the, she cites the opinion, the evidence that says after reviewing, this is page 14 of her opinion, after reviewing the briefing record and arguments presented or the court agrees with Tisch, there is no evidence in the record to either support the claim that racial discrimination caused Dish or Bodie to discriminate against Sickle City or create a tribal issue of fact. Bodie is the sole decision maker for Dish, made no statements, sent no emails or other provided any indication that the reasons for not offering extra rates was due to race. She also carefully addressed the pretext and found that there was no basis to find that she was lying. And when you look carefully, not glossing this over and trying to say, oh, there were shifting reasons. If you look at what she was actually doing in her job as Vice President of Programming, back and forth and back and forth with him, she was responding in good faith to him each time as to his assertions. Thank you, Your Honors, for the privilege of appearing before you. We ask that the summary judgment be affirmed. Mr. Manley, thanks to you. Mr. McNeil, you can pick it up to a minute. On page 15 of the slip opinion, Judge Pratt wrote, and the court is not persuaded that Sickle City reaching broadcasting agreements with other MVPDs equates to establishing irrefutable market rates or means that DISH's only reason for not matching these rates was based on race. That is an upside-down standard. The irrefutable evidence of market rates is not a summary judgment standard. The evidence of market rates is what Comcast and Charter were willing to pay in the words of Warren Schlichting, who was Melissa Boddy's boss's boss, where he said, in another context, another dispute, we have offered to take the same deal Hearst gave DirecTV, as that is no doubt the market rate. So we presented, Circle City presented, its market rates, its MFN rates to DISH, and DISH's answer was, there's nothing more we can do here. But what about her next sentence, just where you were quoting, Circle City cannot show that Boddy's explanation was anything other than a business decision, and there is no proof that that decision was based on McCoy's race. So to get past summary judgment, you have to point to something in the record that would allow a jury or a trier of fact to rely on that and come to the decision that you're advocating. And she's saying she doesn't see anything like that, which is why we've been trying to say, other than, I mean, I take it your main argument is an inference from your feeling that there's evidence of pretext here, but there really isn't anything else other than that. Is there? No, but under Seventh Circuit case law and Supreme Court case law, that's sufficient to get past summary judgment. If it is evidence of pretext, yeah. Right. And so what the concern that this language presents, Your Honor, is that Judge Pratt is trying to meld into the pretext standard a direct evidence standard, which as Judge Hamilton recently said, is circular and contrary to the Hicks decision. So I'll submit from there. We ask that the district court be reversed and the case be remanded for trial.  Mr. McNeil, thank you. Mr. McNeil, thank you. We'll take the appeal under advisement. Our fourth argument.